IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PREMIER RIDES, INC.        *

        Plaintiff     *

      vs.          * CIVIL ACTION NO. MJG-17-3443

MARK STEPANIAN       *

        Defendant    *

\*    \*    \*    \*    \*    \*    \*    \*    \*

<u>MEMORANDUM & ORDER RE: PRELIMINARY INJUNCTION</u>

The Court has before it Plaintiff's request for injunctive relief following the Court's denial [ECF No. 7} of Plaintiff's Request for Temporary Restraining Order [ECF No. 3].  The Court has reviewed the materials submitted relating thereto and has held a hearing, including testimony and the presentation of evidence.  The Court has made the factual findings stated herein based on its evaluation of the evidence and the reasonable inferences drawn therefrom.

I.   <u>INTRODUCTION</u>

Plaintiff, Premier Rides, Inc. ("Premier Rides") commenced the instant action against its former employee, Mark Stepanian ("Stepanian") on November 15, 2017 in the Circuit Court for Baltimore City.  Premier Rides alleged that Stepanian breached the covenant not to compete that was contained within the Non-Disclosure, Non-Competition and Non-Solicitation Agreement ("the

Agreement") by working as an employee or contractor with a competitor, DreamCraft Attractions Ltd. ("DreamCraft"). Premier Rides sought a Temporary Restraining Order to prevent Stepanian from violating the restrictive covenant.

Stepanian filed his Notice of Removal [ECF No. 1] to this Court on the basis of diversity jurisdiction[1] on November 20, 2017. On the same date, he filed the Declaration of Mark Stepanian [ECF No. 4] stating that DreamCraft does not compete with Premier Rides. Under the circumstances, the Court denied Premier Rides' request for a Temporary Restraining Order but allowed Premier Rides to proceed with an evidentiary hearing seeking preliminary injunctive relief. The issue is now ripe for resolution.

II.  BACKGROUND

A.   The Agreement

The Non-Disclosure, Non-Competition and Non-Solicitation Agreement was signed by Premier Rides, as "Company," and Mark Stepanian, as "Employee," on September 24, 2013, three months after Stepanian began working at Premier Rides. Pertinent to

---

[1]   Plaintiff is a citizen of Maryland, and Defendant is a citizen of Virginia.

the instant dispute,[2] Paragraph 8 of the Agreement, the non-competition provision, provides:

> Employee agrees that during his employment and for a period of 12 months after termination of that employment . . . he shall not, on his own behalf or as a partner, officer, director, employee, independent contractor, agent, or consultant of any other person or entity directly or indirectly, engage or attempt to engage in the business of providing goods or services the same as or similar to the goods or services of the Company. Employee shall not involve himself in a capacity the same as or similar to the capacity he served at the Company with any kind of business or enterprise that competes directly or indirectly with the Company's business. Employee understands that this means that he is not permitted to be employed by or perform contract work in a capacity the same as or similar to the capacity he served at the Company for a business or enterprise in the Company's business. Employee expressly acknowledges that the Company is entitled to a court order enjoining any violation of this paragraph even if Employee has not solicited or serviced any of the Company's Customers. The restrictions in paragraphs 8 and 9 of this Agreement are intended to limit Employee from competing with the Company in its role in the design, fabrication, and construction of amusement rides and attractions, and the sales of parts and services for existing amusement rides and attractions.
>
> This paragraph does not prevent Employee from becoming employed by any person,

[2]    Premier Rides' Complaint alleges a violation of Paragraph 8 of the Agreement.  Compl. ¶¶ 8, 17-20, ECF No. 2; see also Plaintiff's Request for Temporary Restraining Order and Preliminary and Permanent Injunctive Relief ¶ 3, ECF No. 3; Memorandum 2, 6-7, ECF No. 3-1.

> government agency, firm, company,
> partnership, corporation, or other entity
> which is an end user of amusement rides
> including but not limited to, operators of
> amusement parks. This Agreement does not
> prevent Employee from accepting employment
> or otherwise becoming involved with entities
> which solicit Customers of the Company for
> services or products other than the kinds of
> services or products provided by the Company
> to any entity. Employee may work for a
> subcontractor of the Company without
> violating the restrictions in paragraphs 8
> and 9 of this Agreement provided the
> subcontractor does not compete with the
> Company.

Agreement ¶ 8, Compl. Ex. A, ECF No. 2-1 (emphasis added).

Referenced in Paragraph 8, Paragraph 9 further restricts Employee regarding non-solicitation:

> Employee shall not, during his employment
> and for a period of 12 months after his
> separation from employment . . . either
> alone, in conjunction with or through the
> use of others, whether as principal, agent,
> employee, trustee or through the agency of
> any person or entity, canvass, solicit or
> accept business from any Customer of the
> Company with which Employee had contact
> during the 24 months prior to his separation
> from employment . . . if the services or
> products to be provided to said Customer are
> the same as or similar to the services and
> products which are or were provided to said
> Customer by the Company.

Id. ¶ 9.

B.  The Amusement Rides Industry

The Amusement Rides Industry is an industry with few direct competitors.  Potential customers range from amusement parks to shopping malls, zoos, and aquariums.  The market itself is global and the current primary growth area is in Asia and the Middle East.  Everyone in the industry tries to sell to the same customers.

The trade association of the industry, the International Association of Amusement Parks and Attractions ("IAAPA"), hosts trade shows, the largest of which is held annually in Orlando with approximately 40,000 people in attendance each year.  The trade shows are the primary environment for networking and commercial interaction.  Volunteer organizations for the development and promotion of safety standards and safety education have been developed and peopled by members of the industry, both suppliers and customers.

C.  Premier Rides

Premier Rides is a Baltimore, Maryland-based company that designs, fabricates, and constructs amusement rides and themed attractions, such as roller coasters, virtual reality rides, towers, and pedal rails.  It also sells parts and services for existing rides and attractions.  Premier Rides generally sells

the hardware, but it is combined with software[3] and other theming elements to create a highly-themed attraction. Premier Rides' main focus is on designing and manufacturing highly-themed roller coasters, and it also sells flying theaters[4] and motion-base[5] attractions. Premier Rides incorporates virtual reality into some of its themed rides, and has installed virtual-reality headsets into rides, but it does not design or manufacture virtual-reality headsets.

Premier Rides' customers include familiar names such as Six Flags, Cedar Fair, Evergrande, Palace Entertainment, Trans Studio, SeaWorld, and Universal Studios. Premier Rides is also working on a project for Wanda, a large Chinese real estate development company. Premier Rides' competitors include a Swiss company, Intamin Rides, a German company, MACK Rides, and Canadian companies, Dynamic Attractions and CAVU Designwerks, Inc. ("CAVU").

---

[3] Typically, the software or "theme" is owned by the customer. The steel fabrication and other major components are often sub-contracted. Premier Rides generally installs and assembles the ride on the customer site and maintains it thereafter.
[4] A "flying theater" is a ride in which guests are "seated" and "the seat moves to a location to where you can see a video at 270 degrees, what seems like 360 degrees, and you're soaring or flying over some experience." M. Turner Dep. at 73:11-12.
[5] Motion-base rides are simulator rides that create the feel of riding on a train or other form of transportation and immerse the rider in an imaginary environment through use of video screens and projection technology.

D.  DreamCraft

DreamCraft, based in Victoria, British Columbia, Canada, designs and manufactures virtual-reality headsets.  DreamCraft was formed in 2016 by a strategic partnership between CAVU and another Victoria-based company, One Bit Labs, Inc.[6]  DreamCraft's website indicates that DreamCraft is "a CAVU Company."  Pl.'s Ex. 7.

DreamCraft is a preferred supplier and subcontracts to CAVU, and the companies work closely together, sharing the same mailing address and having certain senior management in common. For example, Peter Schnable, the founder and Chief Executive Officer ("CEO") of CAVU is a corporate director and past CEO of DreamCraft;[7] Ken Yao, the President and Chief Financial Officer ("CFO") of CAVU is the CFO of DreamCraft.  DreamCraft and CAVU coordinated adjoining booths at IAAPA, sharing a joint marketing video in which DreamCraft was referred to as a sister company that CAVU created to improve the virtual reality experience.

DreamCraft's website promotes attractions that its team has worked on to demonstrate DreamCraft's expertise in the

---

[6]  CAVU owns 90,000 Class A common voting shares, One Bit Labs Inc. owns 90,000 Class B common voting shares, and an independent investor, Yong Liao, owns 20,000 preferred shares. Def.'s Ex. 5.
[7]  Peter Schnable also has worked for Intamin Rides, Premier Rides, and Dynamic Attractions prior to CAVU.

attractions industry, including three rides[8] that are Premier
Rides' attractions.  DreamCraft does not design or manufacture
roller coasters, motion-based rides, or flying theaters.[9]
DreamCraft is a virtual reality and augmented reality service
provider.  Its focus is to design and build virtual-reality
headsets[10] that can be incorporated into amusement attractions.


    E.   <u>Mark Stepanian</u>

    Mark Stepanian is a 27-year-old structural engineer living
in Alexandria, Virginia.  He obtained his degree in structural
engineering from Cornell University in May 2013 and initially
began working with Premier Rides as an intern[11] in June 2012
while still in school.  Premier Rides offered him a full-time
position in April 2013, and he began working for Premier Rides
after graduation in May 2013 as an entry-level project engineer.

---

[8]    Italian Job, Outer Limits, and Revenge of the Mummy.  Pl.'s
Ex. 7.  None of these rides incorporate virtual-reality
headsets.

[9]    But CAVU does. CAVU's stated intention is to focus on
virtual reality rides such as motion-based rides and flying
theaters. CAVU is currently installing a themed roller coaster
called Scrat's Nutty Adventure in Genting Highlands, a Malaysian
theme park, a project for which Premier also bid.

[10]    DreamCraft has filed for patents on its current headset
design.

[11]    To obtain the internship, Stepanian connected with Premier
Rides through the Cornell alumni network.  The President of
Premier Rides, James Seay, is also a Cornell engineering
graduate.

At Premier Rides, Stepanian started in the parts and service division, performing evaluations and maintenance on roller coasters.  He also worked on a service project that involved moving a spinning ride called Sandstorm from one theme park to a different theme park in another state.  After a year, Stepanian moved to the roller coaster division, where he worked until he left Premier Rides in May 2017.

In the roller coaster division, Stepanian provided technical sales support,[12] oversaw the design and integration of rides and systems that manage rides, worked with contractors and vendors, certified built roller coasters as meeting safety standards, maintained project budgets, and prepared maintenance manuals. He also provided support to the company at the IAAPA conference each year and participated in voluntary safety standards organizations as a representative of Premier Rides. Projects that Stepanian worked on included the Wanda Monkey Kingdom ride, the Adventure Dining motion-base ride, a dark ride roller coaster in Doha, the Guangzhou Chimelong roller coaster, and he assisted the sales presentation to Universal Studios related to the Mario Kart video game ride.

---

[12]  With respect to supporting sales of rides, Stepanian would assist Premier Rides' salesperson by providing technical engineering information and explanations to Premier Rides' customers.

After deciding to leave Premier Rides and seek other employment, Stepanian consulted with legal counsel. In his resignation letter of May 22, 2017, he formally asked to be released from his non-compete obligation in the Agreement.[13] By letter on May 26, 2017, Premier Rides refused to release Stepanian. Shortly thereafter, on May 28, 2017, Stepanian communicated to a co-worker that he would not be going to work for CAVU and was looking at other offers because he did not want to end up in a lawsuit with Premier Rides. For the same reason, he also turned down an offer from S&S, a roller coaster manufacturer that he considered a Premier Rides' competitor. Stepanian continued to look for and apply for non-competitive opportunities through online job-boards.

On June 1, 2017, Stepanian was contacted by Peter Schnable, who identified himself as an investor in DreamCraft, to discuss an opportunity to work at DreamCraft. On June 7, 2017, Stepanian entered into a contract with DreamCraft to be its Director of Technical Services. Stepanian works remotely from his home in Virginia and reports directly to Ken Yao, DreamCraft's CFO. Within his first two weeks on the job, Stepanian spent three days at CAVU's Dallas, Texas office being

---

[13]    In the letter, Stepanian included a statement of his position that the Agreement was not enforceable for lack of consideration and failure to define a geographic scope. Pl.'s Ex. 10

briefed by CAVU's then-President on the scope of a CAVU project that was being subcontracted to DreamCraft to incorporate virtual reality hardware and software.  Shortly after, on June 26, 2017, Stepanian met with David Reitterer, CAVU's former technical director, in Guangzhou, China to evaluate a motion-base ride and determine how easily DreamCraft's headsets could be incorporated into the predesigned motion-base system.  On the same trip, Stepanian visited the Genting Park rides in Malaysia, including the CAVU rides in Genting Park.

Since leaving Premier Rides, Stepanian has corresponded with some Premier Rides' customers to inform them of his departure.  During his job search, he interviewed with Six Flags, a Premier Rides' customer.  He has also kept in touch[14] with Aileen Hu from Wanda, with whom he worked on the Premier Rides' project for Wanda.  Since working with DreamCraft, he has attended meetings[15] with companies who were customers of Premier Rides, including Six Flags, Cedar Fair, Evergrande, Palace Entertainment, Trans Studio, SeaWorld, Universal Studios, and

---

[14]    A phone conversation on May 25, June 28, and July 6, 2017, a dinner meeting in the Guangzhou airport on July 13, 2017, a September 3, 2017 conversation about the Mummy attraction, a November 13, 2017 conversation about whether she would be attending IAAPA (she did not attend).
[15]    These meetings were during the IAAPA conference and not initiated by Stepanian. The discussion related to combining DreamCraft's virtual reality headsets into existing rides.

Busch Gardens.  Stepanian's job at DreamCraft includes technical sales support related to adding virtual reality to attractions.

Stepanian married in June 2016, and his current DreamCraft salary of $120,000 per year is the family's sole income since his wife attends graduate school.  Stepanian is also attending Johns Hopkins Carey Business School and has one more semester to complete an MBA with a focus in finance and management.


III. <u>LEGAL STANDARD</u>

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." <u>United States v. South Carolina</u>, 720 F.3d 518, 524 (4th Cir. 2013) (quoting <u>Univ. of Tex. v. Camenisch</u>, 451 U.S. 390, 395 (1981)).  "A preliminary injunction is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." <u>Manning v. Hunt</u>, 119 F.3d 254, 263 (4th Cir. 1997).

To obtain a preliminary injunction, a plaintiff must show that:

1. It will likely succeed on the merits;
2. It is likely to suffer irreparable harm absent preliminary relief;
3. The balance of equities tips in its favor; and
4. An injunction is in the public interest.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008);

*Centro Tepeye v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir.

2013)(en banc).  The plaintiff has the burden of establishing

that it meets the *Winter* factors.  *Dewhurst v. Century Aluminum*

*Co.*, 649 F.3d 287, 293 (4th Cir. 2011).


IV.  DISCUSSION

    A.  Likely Success on the Merits

        1.  Enforceability of Non-Compete Agreement

In the context of preliminary injunctive relief, a

demonstration of success on the merits requires the plaintiff to

clearly establish that the agreement at issue is enforceable

under the governing law.  *Cytimmune Scis., Inc. v. Paciotti*, No.

PWG-16-1010, 2016 WL 4699417, at *2 (D. Md. Sept. 8, 2016),

*reconsideration denied*, No. PWG-16-1010, 2016 WL 6879942 (D. Md.

Nov. 22, 2016).  "Restrictive covenants in employment contracts

are in restraint of trade, and their validity depends on their

reasonableness." *Mansell v. Toys R Us, Inc.*, 673 F. Supp. 2d

407, 416 (D. Md. 2009)(citing *Ruhl v. Bartlett Tree Co.*, 225

A.2d 288, 291 (Md. 1967)).

Under Maryland law,[16] an employer seeking to enforce a

restrictive covenant must establish that the agreement was

---

[16]  The Agreement stipulates that its terms are to be
interpreted according to Maryland law.  Agreement ¶ 14, ECF No.

supported by adequate consideration and that the following four

conditions are met:

> (1) the employer must have a legally
> protected interest; (2) the restrictive
> covenant must be no wider in scope and
> duration than is reasonably necessary to
> protect the employer's interest; (3) the
> covenant cannot impose an undue hardship on
> the employee; and (4) the covenant cannot
> violate public policy.

Deutsche Post Glob. Mail, Ltd. v. Conrad, 116 F. App'x 435, 438

(4th Cir. 2004) (interpreting Maryland law); Simko, Inc. v.

Graymar Co., 464 A.2d 1104, 1106-07 (Md. Ct. Spec. App. 1983);

Becker v. Bailey, 299 A.2d 835, 838 (Md. 1973).

Enforceability depends upon the unique language of the

clause at issue. MCS Servs., Inc. v. Jones, No. CIV.A WMN-10-

1042, 2010 WL 3895380, at *2 (D. Md. Oct. 1, 2010)(citing

Holloway v. Faw, Casson & Co., 572 A.2d 510, 515 (Md. 1990)).

"The test used for a restrictive covenant in an employment

contract is 'whether the particular restraint is reasonable on

the specific facts.'" Intelus Corp. v. Barton, 7 F. Supp. 2d

635, 641 (D. Md. 1998)(quoting Ruhl, 225 A.2d at 291).

In Hekimian Labs., Inc. v. Domain Sys., Inc., the Court

summarized the analysis under Maryland law as follows:

> In sum, the following factors are
> considered in light of the aforementioned
> principles:

---

2-1.

> (1) whether the employee is a skilled
> employee whose services are unique;
>
> (2) whether the covenant is necessary to
> protect the misuse of trade secrets of
> confidential information or to prevent the
> unfair solicitation of customers;
>
> (3) whether there is any unfair exploitation
> of contacts between the employee and the
> customer; and,
>
> (4) whether enforcement would impose an
> unfair hardship on the employee or would
> disregard the public interest.

664 F. Supp. 493, 497 (S.D. Fla. 1987)(citing <u>Budget Rent A Car</u>

<u>of Washington, Inc. v. Raab</u>, 302 A.2d 11, 13 (Md. 1973);

<u>Millward v. Gerstung Int'l Sport Educ., Inc.</u>, 302 A.2d 14, 16

(Md. 1973). The Court noted that these factors represent a

summary, not a substitute, for the analysis required by <u>Becker</u>.


a.  <u>Consideration</u>

Stepanian contends that the Agreement cannot be enforced

because he received no consideration at the time he signed it.

Stepanian asserts that he began working for Premier Rides in

June 2013 but did not sign the Agreement until September 2013,

and at that time, he received no pay increase, no change in

duties, nor did he receive any assurance of job security,

continuing as an at-will[17] employee.  Stepanian cites North

---

[17]   An at-will employment contract is one of indefinite
duration that can be legally terminated by either party at any

Carolina, South Carolina, and West Virginia law to support his position that continued at-will employment is illusory consideration for a covenant not to compete. However, the Court must look to Maryland law to determine if the Agreement is supported by adequate consideration.

"[Maryland] law clearly provides that continued employment of an at-will employee for a significant period constitutes sufficient consideration for a restrictive covenant where there is no allegation of bad faith or other compromising circumstance." Hearn Insulation & Improvement Co. v. Carlos Bonilla, No. CIV. A. AW-09-990, 2010 WL 3069953, at *6 (D. Md. Aug. 5, 2010) (citing Simko, 464 A.2d at 1107–08). What constitutes a significant period is dependent on the facts and circumstances of a particular case. Simko, 464 A.2d at 1107-08. The court in Simko found that continued employment for a period of ten years was sufficient consideration. Id. Courts have also found that a year, specifically "almost a year," of continued employment is adequate consideration. Mona Elec. Grp., Inc. v. Truland Serv. Corp., 56 F. App'x 108, 110 (4th Cir. 2003)(citing Maryland law).

Stepanian continued working at Premier Rides for more than three years after signing the Agreement, and he continued to receive raises and bonuses during that time. Therefore, the
_____
time. Adler v. Am. Standard Corp., 432 A.2d 464, 467 (1981).

Court finds that the Agreement does not fail for lack of consideration.

b.    Legally Protected Interest

"Employers have a legally protected interest in preventing departing employees from taking with them the customer goodwill they helped to create for the employer." Deutsche Post, 116 F. App'x at 438.  However, the scope of the proscribed activity must be properly bounded; an overbroad covenant that simply tries to prevent any kind of competition by the employee is not legally enforceable.  Id.  An employer may seek to prevent a former employee from "using the contacts established during employment to pirate the employer's customers."  Holloway, 572 A.2d at 515. But a restrictive covenant is not enforceable if its sole purpose is to prevent a company's employees from joining another company, thereby making the new company a more efficient competitor. Id.; see also MCS Servs., 2010 WL 3895380 at *3 ("[M]ere protection from enhanced competition is not a protectable interest.").

A second protectable interest under which Maryland courts will enforce a restrictive covenant is where the employee provided unique services to the employer.  Millward, 302 A.2d at 16; Becker, 299 A.2d at 838.  "Unique or specialized skills or services are those 'that would make it difficult to find a

substitute employee.'" Mansell, 673 F. Supp. 2d at 416 (quoting

Ecology Servs., Inc. v. Clym Envt'l Servs., LLC, 952 A.2d 999,

1009 (2008)).  While Stepanian cannot be considered an

"unskilled worker," the work he performed for Premier Rides as a

project engineer was not overly specialized, and there was no

evidence that his position was difficult to fill upon his

termination. Stepanian was hired directly from engineering

school, and "skills acquired by an employee during his or her

employment do not warrant enforcement of a covenant not to

compete." Ecology Servs., 952 A.2d at 1010 (quoting Labor

Ready, Inc. v. Abis, 767 A.2d 936, 946 (2001)).

The Agreement's stated purpose is to "protect[] its

Confidential Information, assets and goodwill . . . ."

Agreement 1, Compl. Ex. A, ECF No. 2-1.  Premier Rides contends

that the non-competition provision in paragraph 8 of the

Agreement prevents Stepanian from exploiting the customer and

potential customer contacts he developed while working for

Premier Rides on behalf of one of Premier Rides' competitors.

As such, the Court finds that the Agreement has a legitimate

corporate objective—protecting its customer relationships and

trade secrets—provided that the language of the restrictive

covenant is narrowly tailored to achieve this purpose.

### c.  Reasonable Scope and Duration

Stepanian contends that the Agreement's scope is overly broad and not narrowly tailored to meet Premier Rides' legitimate corporate objective.  Stepanian also contends that the lack of any geographic scope is unreasonable and, therefore, unenforceable.

The duration of the restriction—12 months after termination of employment—does not appear to be at issue and is within a period of time routinely upheld by Maryland courts.  See, e.g., PADCO Advisors, Inc. v. Omdahl, 179 F. Supp. 2d 600, 606 (D. Md. 2002) ("Maryland has consistently upheld two year limitations on employment with competitors as reasonable."); Millward, 302 A.2d at 17 (finding a two-year duration "reasonable on its face").  Therefore the Court shall focus its analysis on the scope of the Agreement, specifically the non-competition provision that Premier Rides wishes to enforce.

The Agreement has no geographic restriction.  However, "federal courts applying Maryland law have held that in situations where the plaintiff competes for clients on a global basis, a restriction limited to a narrow geographic area would be meaningless; therefore, the absence of such a restriction is reasonable." Deutsche Post Glob. Mail, Ltd. v. Conrad, 292 F. Supp. 2d 748, 756 (D. Md. 2003), aff'd, 116 F. App'x 435; see also Hekimian Labs., 664 F. Supp. 493 (applying Maryland law,

the district court issued an injunction enforcing a restrictive covenant that did not contain a geographic limitation). Under the circumstances herein—Premier Rides, like Hekimian Labs, competes in a global market—the non-competition restriction that is not limited to a specific geographic limitation is reasonable.

Next the Court considers whether the scope of restrictions are reasonable under the circumstances or if they are broader than necessary to achieve Premier Rides' legitimate objective of protecting its goodwill and preventing Stepanian from exploiting the customers and potential customer contacts he developed while working at Premier Rides.

"[T]o be enforceable, restrictive covenants must be specifically targeted at preventing former employees from trading on the goodwill they generated during their former employment." Ameritox, Ltd. v. Savelich, 92 F. Supp. 3d 389, 400 (D. Md. 2015)(quoting Allegis Grp., Inc. v. Jordan, Civil No. GLR-12-2535, 2014 WL 2612604, at *9 (D. Md. June 10, 2014)). "Maryland courts have recognized that covenants not to compete are not justified 'if the harm caused by service to another consists merely in the fact that the former employee becomes a more efficient competitor just as the former employer did through having a competent and efficient employee.'" Ecology Servs., 952 A.2d at 1008 (quoting Holloway, 572 A.2d 510).

However, a non-competition provision may be justified under circumstances where the former employee was compensated for developing customer relationships[18] such that the customers are likely to follow the former employee.  Id.  See also Ruhl, 225 A.2d at 292 (recognizing the importance of the personal relationship, and noting that restrictive covenants were held valid "when the element of competition in the sale of the product was less significant than the employee's relationship with the persons he served.").

Here, the non-competition clause in the Agreement restricts Stepanian from working "in a capacity the same as or similar to the capacity he served" at Premier Rides "with any kind of business or enterprise that competes directly or indirectly" with Premier Rides' business. Agreement ¶ 8.  The clause specifies that the restrictions "are intended to limit [Stepanian] from competing with [Premier Rides] in its role in the design, fabrication, and construction of amusement rides and attractions, and the sales of parts and services for existing amusement rides and attractions."  Id.  Further, the clause

---

[18]    Typically, salespersons, delivery personnel, or other employees who create or have direct relationships with customers.  "The interest protectable by a non-compete provision is the goodwill that the employee creates with the customer while working for the employer. This guards against the risk that the customer will be loyal to the employee with whom he has a relationship, rather than the relatively impersonal employer." Seneca One Fin., Inc. v. Bloshuk, 214 F. Supp. 3d 457, 465 (D. Md. 2016).

states that Premier Rides "is entitled to a court order enjoining any violation of this paragraph <u>even if [Stepanian] has not solicited or serviced any of [Premier Rides'] Customers</u>." <u>Id.</u> (emphasis added). The provision's wording clarifies that Stepanian may work for an end user of amusement rides or for a subcontractor of Premier Rides "provided the subcontractor does not compete with" Premier Rides. <u>Id.</u> The restriction "does not prevent [Stepanian] from accepting employment or otherwise becoming involved with entities which solicit Customers of [Premier Rides] for services or products other than the kinds of services or products provided by [Premier Rides] to any entity." <u>Id.</u>

The restriction does not prevent Stepanian from working in the industry, but it does restrict him from working for a competitor. Stepanian worked for Premier Rides as a project engineer, not in a sales capacity. Although he necessarily was introduced to and worked with customers, the customer relationship was with Premier Rides, not Stepanian. Premier Rides' President testified that customers make their buying decisions based on two key factors: first, budget, and second, the impact that the attraction will have on increasing attendance.

The Court finds the circumstances similar to the line of cases where the non-competition restriction is not justified

because it is trying to prevent competition rather than protect goodwill. Premier Rides' non-competition provision prohibits more activity than needed to protect Premier Rides' legally protected interest. See, e.g., Becker, 299 A.2d at 838 (comparing cases in which restrictive covenants were deemed enforceable with those that were not); MCS Servs., 2010 WL 3895380 at *3 (finding that the language of the restrictive covenant was overbroad because it was constraining the list of potential employers "instead of targeting possible goodwill-thieving activities"); Seneca One Fin., Inc. v. Bloshuk, 214 F. Supp. 3d 457, 462 (D. Md. 2016)("The non-competition provision in the Contract is designed more to prevent former employees from working for any competitor of Seneca One than to prevent the employees from taking advantage of customer goodwill created while employed at Seneca One. This is not a legally protected interest.").

Further, the Agreement contains separate provisions to protect against the solicitation of Premier Rides' customers and to prevent disclosure of confidential information.  The Court notes that neither the non-solicitation nor the non-disclosure clauses are the restrictive covenants that Premier Rides alleges that Stepanian has violated.  Rather, Premier Rides alleges that Stepanian has violated the Agreement simply by accepting employment with DreamCraft.  Compl. ¶ 20, ECF No. 2; see also

Mem. in Support of Plaintiff's Request for Injunctive Relief 7,
ECF No. 3-1 ("By working for DreamCraft during the 12-month
period after his resignation from Premier Rides, Stepanian is
engaging in conduct prohibited by paragraph 8 of the Agreement.
Thus, Stepanian is in direct and material breach of his
covenants in the Agreement.").

Further, Premier Rides' request is that the Court enjoin
Stepanian "from serving DreamCraft or any affiliated entity as
an owner, officer, director, shareholder, partner, employee,
agent, advisor, consultant, manager, licensor, or in any other
capacity."  Compl. Prayer for Relief (a), ECF No. 2.  While
recognizing that this request is inconsistent with the language
of the non-competition clause itself, it is notable that some
courts have ruled that a covenant prohibiting the former
employee from working for a competitor "in any capacity" is
impermissibly overbroad and invalid per se.  See, e.g., Gen.
Parts Distribution, LLC v. St. Clair, No. 11-CV-03556-JFM, 2011
WL 6296746, at *4 (D. Md. Dec. 14, 2011)(finding the scope
properly bounded because it did not seek to prohibit the
employee from working "in any capacity" with any competitor);
Avion Sys., Inc. v. Thompson, 666 S.E.2d 464, 468 (Ga.
2008)(holding that restricting employment "in any capacity" is
impermissibly overbroad and not reasonably necessary to protect
the employer's interests); Arpac Corp. v. Murray, 589 N.E.2d 640

(Ill. 1992) (restricting an employee from working "in any capacity" was held void as against public policy because it did not serve to protect employer's interests in its customers, but rather was designed to stifle any competition employee might offer).

Accordingly, the Court finds that the Agreement's Paragraph 8 non-competition restrictive covenant is wider in scope than reasonably necessary and is therefore, not enforceable. The Court notes that it may be possible to use the "blue pencil" doctrine[19] to excise the overbroad portion and then determine if the remaining restrictive language in the Agreement is enforceable.

> "If a restrictive covenant is unnecessarily broad, a court may blue pencil or excise language to reduce the covenant's reach to reasonable limits." However, "[a] court [may] only blue pencil a restrictive covenant if the offending provision is neatly severable." Although "offending provision[s]" may be stricken, "Maryland courts have excised restrictions that render a covenant overbroad only in circumstances in which the restrictions are contained in a separate clause or separate sentence."

Ameritox, 92 F. Supp. 3d at 400 (quoting Deutsche Post, 116 F. App'x at 439).

---

[19] See Fowler v. Printers II, Inc., 598 A.2d 794, 802 (1991) ("[T]he court takes its pen and draws a line through the offending restriction. If the covenant is still enforceable after the applicable language is removed, then the remaining portions of the contract are enforceable.").

The current state of the record does not, however, present a potentially viable editing of the Agreement to render it enforceable against Stepanian for actions he has taken and/or is likely to take justifying a preliminary injunction. Nevertheless, the possible editing of the Agreement will be considered in light of the evidence in a later phase of the instant case.

### d. Hardship on Employee

Restrictive covenants can also be unenforceable if they pose an undue hardship on the former employee. Stepanian asserts that if the injunction requested by Premier Rides' is issued, he will lose his job. As a young, newly-married, sole breadwinner for his family, losing his salary would be a severe hardship. He has substantial student loans to repay and the couple is currently living paycheck to paycheck. His wife is in graduate school pursuing a degree, so she is unable to contribute financially. Stepanian adds that he would also likely have to drop his current pursuit of an MBA at Johns Hopkins University Carey Business School due to an inability to continue making payments.

However, the Court has found that the non-competition clause, as well as the injunctive relief wording requested by Premier Rides, is overly broad. If any injunction were to be

issued, it would necessarily be tailored to protect only against
Premier Rides' legitimate interest in protecting its customer
relationships and confidential information.  If such were
issued, Stepanian need not cease his employment with DreamCraft,
and any restrictions imposed by the requirement to honor the
Agreement's enforceable covenants are unlikely to cause undue
hardship.

### e.  Public Policy

"[T]he public has an interest in the enforcement of
reasonable restrictive covenants." Intelus, 7 F. Supp. 2d at
642.  But "stifl[ing] healthy competition," has been held
contrary to "broad public policy."  Deutsche Post Glob. Mail,
292 F. Supp. 2d at 756.

To the extent that the non-competition restrictive clause
has been found to target competition rather than to protect a
legitimate interest, public policy considerations weigh against
enforcement.

### 2.  Summary

The Court has found that the non-competition clause is
unenforceable as written.  Assuming, without determining, that
the Agreement could be blue-penciled to be enforceable, the
Court's next inquiry would be whether Premier Rides has shown

that it is likely to succeed on the merits of proving that
Stepanian has breached the Agreement.

Stepanian's having accepted employment with DreamCraft is
not, of itself, a violation of the Agreement.  Further, it is
not clearly established that the work Stepanian is doing for
DreamCraft is in competition with Premier Rides.  While the
Court accepts that Premier Rides does incorporate certain
virtual reality elements into its rides, it does not manufacture
nor design virtual reality headsets, which is the work that
Stepanian is currently engaged in.  It does appear, however,
that Stepanian has engaged in similar project management and
design work in China for DreamCraft subcontracting to CAVU,
which may be considered in competition to Premier Rides.  Again,
however, competition is not the evil to be avoided here, but
rather the improper taking of Premier Rides' goodwill and
confidential information.

In his role, Stepanian was introduced to Premier Rides'
customers, and he had access to customer lists and other
confidential information such as pricing.  Stepanian admits that
he has been in contact with companies who are customers of
Premier Rides, and he has maintained contact with at least one
individual, Aileen Hu, whom he met while working on a Premier
Rides' project.  However, because all Premier Rides' competitors
compete for the same set of customers, it is not evident that

Stepanian retained or used any Premier Rides' customer lists.
Stepanian's testimony, which the Court found credible, is that
he was brought into meetings with those customers at the IAAPA
conference, not that he initiated those meetings, and his role
therein was to provide technical explanations.  The Court finds
that it is highly probable that the customers who attended the
IAAPA conference were there to meet and obtain information from
all the companies displaying their competing products and
services.  There is no evidence that Stepanian divulged
confidential customer information to DreamCraft or any other
third party.  The Court finds that Stepanian has not been
engaged in pirating customers.

Premier Rides provided evidence that Stepanian had retained
a confidential maintenance manual in his personal email account.
However, there was no evidence that it was used or revealed to
any third party, and it has subsequently been deleted.

Based on the testimony and other evidence considered by the
Court, it is not evident that Stepanian has violated any
reasonable restrictions contained within the Agreement.  Premier
Rides has failed to establish a likelihood of success on the
merits.

B.  Other Winter Factors

Because the Court has found that Premier Rides has failed to establish a likelihood of success on the merits, the Court must deny preliminary injunctive relief.  See CytImmune Scis., Inc. v. Paciotti, No. PWG-16-1010, 2016 WL 6879942, at *2 (D. Md. Nov. 22, 2016).  However, the Court notes that Premier Rides also fails to establish the requisite irreparable harm.

"Although irreparable harm may be found when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, harm is not 'irreparable' if it can be compensated by money damages." Ameritox, 92 F. Supp. 3d at 403 (citations omitted).  Premier Rides was unable to identify any lost customers or projects resulting from Stepanian's termination or subsequent employment with DreamCraft.  According to the testimony of Premier Rides' president, no contracts have been lost, and the lawsuit is based on unsupported suspicions that there is a threat to Premier Rides' goodwill.

Mere speculation is insufficient for the Court to find irreparable harm. See De Simone v. VSL Pharm., Inc., 133 F. Supp. 3d 776, 799 (D. Md. 2015)("The 'irreparable harm' to be suffered must be 'neither remote nor speculative, but actual and imminent.' quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991)).  Further, Maryland

does not recognize the "inevitable disclosure" doctrine that would support an injunction to prevent "threatened future disclosure or use of a trade secret." <u>Ameritox</u>, 92 F. Supp. 3d at 404.

Accordingly, Premier Rides has failed to show that it is likely to suffer irreparable harm. And under the circumstances of the instant case, the balance of equities and public interest would not weigh in favor of enjoining Stepanian from continuing his employment with DreamCraft.

V.    <u>CONCLUSION</u>

For the foregoing reasons:

1.    Plaintiff's Request for Preliminary Injunctive Relief [ECF No. 3] is DENIED.

2.    Defendant shall fully comply with the Standing Order Concerning Removal [ECF No. 5] by March 2, 2018.

3.    Defendant's Answer to the Complaint shall be filed by March 9, 2018.

4.    Plaintiff shall arrange a Case Planning Conference to be held by March 16, 2018.

SO ORDERED, on <u>Friday, February 23, 2018</u>.

_____/s/_____
Marvin J. Garbis
United States District Judge
